* This opinion is a slightly edited version of the bench opinion delivered on October 22, 1981. The editing is not intended to make any substantive change of any kind. The editing—primarily directed at eliminating errors and awkwardnesses of syntax and punctuation—is intended to bring the opinion up to some minimum level of intelligibility. The edited opinion is now the official opinion.

Howard L. TERRY and W. H. Hunt,

v.

The PENN CENTRAL CORP., and Colt Industries, Defendants.*

Civ. A. No. 81–3955.

United States District Court,
E. D. Pennsylvania.

Oct. 22, 1981.

Peter Hearn, Julia A. Conover, Jeffrey P. Libson, Pepper, Hamilton & Scheetz, Philadelphia, Pa., A. B. Conant, Jr., Ivan Irwin, Jr., Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., Marshall, Bratter, Greene, Allison & Tucker, New York City, Prickett, Jones, Elliott, Kristol & Schnee,

John H. Small, Wilmington, Del., for plaintiffs.

Raymond T. Cullen, John H. Lewis, Jr., Morgan, Lewis & Bockius, William Zeiter, Philadelphia, Pa., Kenneth Kramer, Shearman & Sterling, New York City, for Penn Central.

Christopher K. Walters, Reed, Smith, Townsend & Munson, Philadelphia, Pa., Arthur L. Liman, Paul, Weiss, Rifkind, Wharton & Garrison, Gerald D. Stern, Colleen McMahon, New York City, Jay Cohen, Philadelphia, Pa., William Hackney, J. Tomlinson Fort, Pittsburgh, Pa., for Colt Industries.

LOUIS H. POLLAK, District Judge.

This is an action for an injunction and for declaratory relief brought by the plaintiffs, Messrs. Terry and Hunt—Messrs. Terry and Hunt are citizens of Texas—against the Penn Central Corporation.

Colt, on its application resisted by plaintiffs, was permitted by me to intervene as a party defendant.

The shape of this proceeding has changed in the course of the very brief time since the initial papers were filed in the sense that what was initially sought was a preliminary injunction, but the parties have agreed that the hearing which has been conducted which involved two days of evidentiary hearings and a day of argument would constitute a hearing on the merits. What follows will comprise my findings of fact and conclusions of law with respect to this matter.

Some background may be useful at the start. As I have said, this is an action for injunctive and declaratory relief. It rests on a variety of bases both as to jurisdiction and as to cause of action. It is in some of its aspects a diversity action between citizens of Texas and a corporation which is incorporated in Pennsylvania and with its principal place of business in New York, namely, Penn Central. In that posture the case is one in which plaintiffs claim entitlements under the amended articles of Penn Central of which they, plaintiffs, are share-

holders, holders of shares of stock in what is entitled a first series preference. They claim also under provisions of the New York Corporation Law and under the Pennsylvania Business Corporation Law and, finally, they make claims which, as will appear shortly, are, in effect, cumulative of the common law and statutory claims under the Federal Securities Statutes.

The plaintiffs Terry and Hunt own substantial blocks of the so-called $5.27 convertible preference stock, first series, of Penn Central which was issued to them, as will shortly appear, as the fruit of a transaction under which Marathon, in which Messrs. Terry and Hunt and others were principal shareholders, was acquired on Penn Central's behalf through the medium of a wholly-owned subsidiary of Penn Central, namely, Holdings.

Mr. Terry, in addition to his substantial shareholdings, is a director of the Penn Central Corporation. It was one of the terms of the Penn Central/Marathon transaction that two members of the Marathon board, Mr. Terry, who was chairman of Marathon's executive committee, and Mr. Woodfin, who was its chief executive officer, became members of the Penn Central board. Mr. Woodfin is not a plaintiff in this action.

Defendant Penn Central is the reorganized successor to the Penn Central Transportation Company, it having emerged from reorganization in October of 1978. The Penn Central Corporation is engaged in a variety of lines of business, of which railroading is not one.

The defendant Colt is likewise a Pennsylvania corporation with its principal place of business in New York.

What is sought under this lawsuit is to enjoin Penn Central and Colt from proceeding further with a proposed acquisition by Penn Central through Holdings of Colt unless and until the plaintiffs are afforded the rights that they assert that they are entitled to in connection with the Penn Central/Colt transaction.

In summary form, plaintiffs argue that they are entitled by the amended articles of Penn Central to a separate vote of the series of first preference shares of which they are members and that without approval of two-thirds of that series the Penn Central/Colt transaction cannot go forward. The same entitlement is claimed by plaintiffs pursuant to certain provisions of the New York Business Corporation Law. This claim of entitlement is at odds with the position of defendant Penn Central and also defendant Colt, though, of course, it's not up to defendant Colt to be determining who votes for Penn Central.

It is Penn Central's intention at the shareholders meeting now scheduled for October 29 that approval be conditioned on the achieving of a majority vote of that quorum of shareholders present or by proxy at the shareholders meeting and it is the position of Penn Central that that much will conform with requirements of the New York Stock Exchange and that no additional approval is required.

It is the further prayer of plaintiffs that they be held to be entitled to dissenters' rights with respect to the proposed transaction, at least unless they have been determined under their initial claim to be entitled to the two-thirds series vote, whether under the articles or under New York law.

Under the third count of plaintiffs' complaint they assert that, in any event, the transaction cannot be validly approved from the standpoint of Penn Central unless there is approval at the shareholders meeting by an absolute majority of all holders of all series and classes of Penn Central stock, not merely a majority of the quorum. That claim is said to arise under Pennsylvania law, statutory and/or case law, as, indeed, is the claim for dissenters' rights under count two.

Finally, the claim under the Federal Securities Laws which is the basis for count four is that the proxy materials distributed by Penn Central and by Colt in connection with the proposed Penn Central/Colt transaction are misleading in numerous respects insofar as they do not specify the variety of

entitlements which plaintiffs have asserted in their first three counts.

The origin of this dispute can really be traced to Penn Central's emergence. from reorganization. At that point in 1978 one of Penn Central's principal assets was a huge loss carry forward and it was a major part of—and remains to this day and can be expected to continue for some years into the future—a major part of Penn Central's business strategy, to develop ways in which that loss carry forward could be given maximum utility. The particular dominating strategy was to be the acquisition by Penn Central of various enterprises with strong income prospects, which income, turned to the benefit of Penn Central, would be sheltered for some extended period of time by this loss carry forward.

It was also a part of the Penn Central strategy that the acquisition program should be with a view to making Penn Central, indeed, a diverse collective of enterprises.

The first step taken by Penn Central to implement this strategy was to create the wholly-owned subsidiary, Holdings, which was to be the acquirer of the enterprises to be acquired. The first step in the program was the acquisition in 1979 of Marathon. As I have noted, Marathon was an enterprise which was substantially dominated as to direction by the group of persons of whom Mr. Terry and Mr. Hunt are prominent members in association with Mr. Woodfin.

To accomplish that transaction, basically what was proposed, put in simplest terms for summary purposes, was to make available through Penn Central a new class of preferred stock, a first series of which would be issued to Marathon shareholders in exchange for their Marathon interests. Penn Central authorized the issuance of 30 million shares of a new class of special preference stock. This was a series, of course, intended to be superior to its 100 million authorized shares of common stock.

The proxy statement describing these shares characterized the new preference stock in the following form: "In order to provide the company with maximum flexibility, and as permitted by Pennsylvania law, article 8 would vest authority in the company's board of directors to issue from time to time the new preference stock in such series as it shall create and in connection with the creation of each such series to fix by resolution the full, limited, multiple, fractional or no voting rights and the designations, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights and other special or relative rights of such series."

In article 6(a) of the present amended articles of Penn Central, it says with respect to preference stock: "The board of directors of the corporation shall have the full authority permitted by law to fix by resolution full, limited, multiple, fractional or no voting rights and the designations, preferences, qualifications, limitations, restrictions, options, conversion rights and other special or relative rights of the preference stock or any series of the preference stock that may be desired and which have not been fixed in these articles."

Utilizing the authorized preference stock, the Marathon deal was negotiated and implemented. That deal contemplated and resulted in the issuance by Penn Central of 6,646,182 shares of what were designated first series preference stock. The terms of issuance of that first series were negotiated out between representatives of Marathon and representatives of Penn Central and the results of those negotiations were an agreement of merger. It was pursuant to that agreement and completed Penn Central/Marathon transaction that Messrs. Hunt and Terry acquired their large blocks of first series preference stock; and their first claim, which will be examined in detail in a minute or two, rests on what they assert to be rights accruing to them from the provisions of 5(d) of article 6 of the amended articles which, in their view, set limits on the manner in which Penn Central can go forward to issue any further series of preference stock—limits which, it is plaintiffs contention, bind Penn Central with respect to the Colt transaction now

contemplated and about to be consummated.

The Colt transaction has been generated in this past summer and autumn. It follows in its general pattern the Marathon transaction, Holdings to acquire Colt as an operating subsidiary and Penn Central, which owns all of Holdings, to issue a substantial new series of preference stock.

The negotiations were reported to the Penn Central board at a meeting in early summer by the chairman, Mr. Dicker, who there asked and received authorization to enter into a letter of intent with Colt. The letter of intent described a transaction which was contemplated but which was somewhat modified by late September.

The board continued to consider the matter as the summer advanced. Though Mr. Terry had joined his fellow directors in authorizing Mr. Dicker to enter into the letter of intent, he and Mr. Woodfin and two other board members voted against further pursuit of the transaction at the August meeting. At the September meeting, the last one to consider the transaction, the board approved the proposal (as subsequently communicated to the shareholders of the two corporations in the proxy materials referred to) by a vote of 13 to 3, Mr. Terry again one of those opposed, Mr. Woodfin this time with the majority.

In the proxy materials Mr. Terry's ground of opposition was set forth as follows: "In my opinion, the Colt acquisition would not be in the best interests of Penn Central's shareholders and Penn Central would be a better and stronger company without Colt. Also four directors voted against the Colt merger at the August 27 board meeting and any change was made after the adjournment."

A few days following the September meeting, proxy materials were sent out and those materials described the substance of the transaction. The full details I think need not be described at this point except to say that the Colt shareholders are offered a combination of preference stock and common stock of Penn Central or $100 in cash for each of their shares, and the entitlement and total entitlement of Penn Central shareholders with respect to the transaction is to vote at the shareholders meeting at the end of October at which a majority of the quorum will suffice for Penn Central approval.

In summary form, the comparative features of the first and second series of preference stock—the first series which exists, the second series which is to be issued as a result of the Colt transaction—are as follows: The number of first series preference shares is 6,646,182. The proposed second series would be 9,297,163. The preferred dividend to which the first series has entitlement out of Penn Central's earnings is $5.27 to a total of some $35 million. The second series entitlement is to a $4.75 dividend aggregating some $44.2 millions. The liquidation preference of the first series is forty-seven and a quarter, that of the second series fifty. The relative conversion ratios are 1.63 for the first series, .9091 for the second and, with respect to voting rights, in normal times each member of the first series and each member of the proposed second series would vote with the common as a class. In the event of default on dividends for four successive quarters, the first series preference would be entitled to vote for two additional directors, an election to which the common would not be party. The proposed second series shareholders would also be entitled to vote for those two additional directors and would, in addition, be entitled to vote with the common for the balance of the directors.

It may be noted that with respect to that discrepancy between the voting rights of the first series and of the second series— that is to say, that the second series would be entitled to vote with the common as well as for the two additional directors in the event of default—it may be worth noting that that discrepancy is hard to square with the text of language contained in the Marathon proxy materials which says in the second to last paragraph on page 21: "So long as the holders of special preference stock are entitled to such class voting rights they shall not be entitled to vote in the

election of PCC directors other than such two additional directors," the prior text, which I won't belabor, having used the phrase "new preference stock" to refer to what we would understand to be the first series preference and "special preference stock" as meaning the entire class. There is a way of meeting that textual discrepancy which counsel for defendants have labored with which involves noting that all of that discussion is under captions which are descriptive of the first series preference stock or what is there called the new preference stock and, in short, that it is accurate as to them, even if it is not accurate as to the newly emerging proposed second preference stock.

I think that substantially identifies the relative features of the two series—the one existing series, the one proposed series of special preference stock. It was against this background that on September 30th the complaint in this proceeding was filed.

I propose to address first the claims made under count one. As I have indicated, they are of two sorts, but both to the same point, namely, both to the point that Mr. Terry and Mr. Hunt and other members of the first series preference group are entitled to participate in a series vote in which two-thirds would be required to vote in favor as a condition of Penn Central approval of the Colt transaction.

The two different bases for making this claim are: (1) Article 6, section 5(d) of the amended and restated articles of incorporation of Penn Central; and (2) The New York Business Corporation Law.

Let me turn first to section 5(d) of article 6. Section 5(d) begins by saying: "The corporation may, in the manner provided by article 9 hereof and as permitted by Pennsylvania law, from time to time alter or change the voting rights, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights or other special or relative rights of the first series preference stock; provided, however, that without the affirmative vote of the holders at least two-thirds of the outstanding shares of all series of preference stock, the corporation shall

not amend, alter, change, add or insert any provision in these articles which, or authorize the merger or consolidation of the corporation with any other corporation if the plan of such merger or consolidation contains any provision which if contained in these articles, would (i) make any adverse change in the voting rights, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights or special or relative rights of preference stock, (ii) authorize a new class of stock senior or superior to preference stock, or (iii) increase the number of authorized shares of a senior or superior class of stock."

I will pause at that point to see how that language is parsed. It is the claim of plaintiffs that the proposed Colt transaction would, within the meaning of subdivision one, "make [an] adverse change in the voting rights, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights or special or relative rights of preference stock."

Since at this present time the first series preference stock constitutes by itself the entire class of preference stock, it is plaintiffs' assertion that they, as a class, are entitled to the two-thirds vote by reason of the impact on the existing class members, namely, themselves, of the proposed second series preference stock.

Now, I have noted that there were three distinct contingencies which give rise to the two-thirds class vote relied on by the language I have quoted. The second and third of these relate respectively to authorizing a new class of stock senior or superior to preference stock or increasing the number of authorized shares of a senior or superior class of stock. What is contemplated here, of course, is the issuance of another series of preference stock. Accordingly, that is not covered by authorizing a new class of stock senior or superior to preference stock or increasing the number of authorized shares of a senior or superior class of stock. The claim here is that the new series, by virtue of its terms, which are different from the terms of the first series in certain respects which I have summarized, would,

when issued, constitute an adverse change in the voting rights, preferences, qualifications and so forth of preference stock, namely, the first series.

The second and third contingencies not relied on here which require a two-thirds vote on the authorization of a new class of stock senior or superior or increasing the number of authorized shares of a senior or superior class of stock would seem to suggest very strongly that the authorization of a new class of stock or increasing the number of authorized shares of a class of stock equivalent to the preference stock would not be within the proscription of section 5(d), and yet it is plaintiffs' legal claim that the Penn Central board of directors is, indeed, inhibited from creating an equal or pari passu class, inhibited, that is, to the extent of having any such issuance or authorization contingent on a two-thirds vote of the existing members of the class. Plaintiffs' reply memorandum says this: "Nor do plaintiffs contend that PCC can never issue a superior or parallel series of preference stock. Plaintiffs simply contend that they are entitled to a class vote whenever the board proposes to issue such shares."

Taken in that broad posture, I find that the construction which plaintiffs put upon this portion of 5(d)—and I will deal with its later portion in a moment—cannot be supported; that is, it seems to me to inhere in the logic of 5(d) and in the broader language of authorizing a huge class of preference stock of which the stock issued to the Marathon shareholders was explicitly understood to be only a first series, that subsequent series of preference stock would be or at least could be equivalent in status.

I would think it clear, given the organization of the three sub-provisions which I have read, that if there were any intention to inhibit the board from issuing equivalent series, such inhibition would have been made explicit not only in the proxy materials but in the amended articles themselves.

The plaintiffs' strongest reliance in support of their contention that 5(d) is a restraint on the issuance or authorization of equivalent shares is on the last sentence of 5(d): "Nothing in this section 5 shall require a class vote or consent in connection with the authorization, designation, increase or issuance of any shares of any class or series of capital stock which is subordinate to shares of first series preference stock as to dividends and liquidation preference," and then further language about bonds, mortgages and debentures. That language is intriguing but I think ultimately not compelling.

What it is in terms is a statement that section 5 does not apply to any authorization or issuance of shares subordinate, not in every respect to the first series, but as to dividends and liquidation preference. I cannot read it by negative implication as being what I would think would have to be found to be an explicit and precise reservation of the sort plaintiffs are contending for, namely, a limitation on the authorization or issuance of any equivalent series.

Moreover, if there were to be any such limitation, one would expect that limitation to be up in the language which I have been addressing first which sets up the three categories which call for a two-thirds class vote, the second and third of those both relating to authorization of or issuance of senior securities.

The question then with respect to the first sentence of 5(d) is whether the issuance of the second series, because of the particular terms of that second series, constitutes in any sense an "adverse change" in any of the series of categories relating to the voting rights, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights or special or relative rights of preference stock.

On the whole, the logic of this entire paragraph as it's focused on the language I have just read would suggest that what is sought to be protected here are the terms of the preference stock as opposed to the terms of other stock issued by the corporation and that focus is, I think, emphasized and underscored by the other part of section 5(d) which calls for a two-thirds vote, to which I have not yet adverted.

The third to last sentence is of the following order: "Without the affirmative vote of the holders of at least two-thirds of the outstanding shares of first series preference stock, the corporation shall not amend, alter, change, add or insert any provision in the articles which, or authorize the merger or consolidation of the corporation with any other corporation if the plan of such merger or consolidation of the corporation contains any provision which if contained in these articles, would adversely affect the first series preference stock but would not adversely affect each other series of preference stock."

It is that latter sentence, one would think, which is structured so as to operate as a guarantee of a particular series as against other series within the entire class of preference stock. However, that is not perhaps by itself conclusive of the construction of sub-one of the first sentence.

The question which must be addressed directly, I think, is whether the issuance of the second series, given its particular terms, can be said to make any "adverse change" in—without repeating all of the language—the various special or relative rights of preference stock.

It is defendants' position that the issuance of the second series does not by itself work any change at all in the preference stock which is now outstanding—namely, the first series, which is the entirety of the existing class.

It is defendants' supporting view that, in any event, article 6 gives the board of directors power, so defendants say, without limitation from 5(d) to fix the terms of stock which they have authorization to issue and, of course, 30 million shares of preference stock have already been authorized.

Plaintiffs are remitted to finding an "adverse change" in that entitlements are conferred on second series preference stock which are in some sense, plaintiffs would say, competitive with, and, to that extent, disparaging of, the claims already vested in the first series preference stock.

The only sense in which it can be asserted that, just as written, the new entitlements of the second series are superior to those of the first series relates to the disparity in voting rights which I have already mentioned, that is to say, the entitlement of the second series not only to vote for two additional board members with the first series but also to participate in the general election in the event of a period of four successive quarters of default on dividends. That is not in terms a limitation on the existing voting rights of the first series.

Is it, by necessary implication, a form of disenfranchisement? Not so, it seems to me, within the meaning of 5(d), that is to say, an "adverse change" in voting rights.

Of course, the issuance of some 9 million shares of preference stock will mean that the existing 6 million shares of preference stock will have less of a voice in corporate affairs, but that was most clearly contemplated in the original authorization of 30 million shares. This cannot be an unforeseen event for the group of first series preference stock. The fact that the second series will also enjoy, in the possible event of default on dividends, participating in two elections, one with the first series and one with the common, thereby enjoying a right enjoyed by neither the first series nor the common, does not seem to me demonstrably to be an adverse change in the voting rights of the first series. It would seem to me, without calling it a change necessarily in the entitlements of the common stock, to be likely to be regarded as disparaging of the common voting strength in that remote and one-would-hope-to-be-avoided contingency of default on dividends; for this would be a new voting strength which, if they had any interest at all in their own separateness, would be one that would be distinct from and, to that extent, competitive with the common.

I think it can only be matter for wildest speculation whether on that uncertain day the first series preference would be aligned with or in competition with the second series preference. My instinct would tell me that the two series or many series of prefer-

ence stock would have collective interests as against the common rather than distinct interests, but also that my intuition in that respect may not be warranted; but I certainly have no ground for concluding empirically that a counter-intuition is warranted, and so I cannot make of the difference between these voting entitlements anything which could be characterized as constructively a change, and an adverse one at that, in the current voting rights of the first series.

I use the words "constructive change" because, quite manifestly, there is no change in any absolute sense of the existing entitlements and to work the claim into the language of 5(d) we must be talking here, as with respect to other aspects of the second series preference stock, about a constructive change in the first series entitlements. The entitlement to dividends of the second series along with the first series will, of course, make for a larger claim by the totality of preference stock on the earnings of the Penn Central/Colt combination as against the existing situation in which the first series are alone in their claim on the Penn Central earnings. To say that being partners in this aggregate claim is disparaging to the first series is, in effect, to be making predictions about the business consequences of the proposed coming together of Colt and Penn Central; and I think the parties, whatever else their differences are, are as one on the proposition that it is not up to a United States District Judge to be exercising business judgment, assuming he or she had any, with respect to the results of such a transaction.

Plaintiffs have sought to avoid being cast in the role of asking the court to exercise business judgment by insisting that their view of disparagement or dilution of plaintiffs' current protected dividend entitlement rests solely on what is regarded as an objective perception of the transaction based solely on the figures in the proxy material in the various *pro forma* statements. We've gotten, pursuant to the careful testimony of plaintiffs' expert, Professor Walter, making calculations from the *pro forma* statements, a showing that the

dividend coverage *pre*-Colt transaction is more favorable than *post*-Colt transaction, the ratios being 1.98 before and 1.4 afterwards.

Also we are offered the calculation that liquidation coverage, which is a calculation of tangible net worth divided by the equity value of the preferred, is more favorable *pre* than *post* the transaction—4.82 to 1 *pre* and 2.87 to 1 *post*.

At this point I realize I failed to define the dividend coverage formula which Professor Walter offered. That was defined as 1980 net income of Penn Central alone pre the transaction and divided by the sum of total interest expense plus the dividend preference of the existing series as compared with 1980 combined net income divided by the aggregate interest expense of the two enterprises and the aggregate dividend preferences.

I have no quarrel with the arithmetic. It may not have been necessary to bring in an expert to produce that arithmetic and, indeed, it was strongly urged by defendants that no such showing would be useful to the court. It may not have been defendants' articulated position that the arithmetic may have been understood or not understood by the court but that an expert would not help to explain. But it was clearly defendants' strong submission that the issues of law could not be facilitated in any way by speculation as to economic impact, and I think in that respect the position is one that I agree with as a matter of law—that the tests which plaintiffs offer to show the economic disadvantage to themselves of this transaction are, though to be sure, drawn from the data contained in the proxy materials, ultimately nothing but ground for saying that the economic picture is less good *post* the transaction than *pre* for those in plaintiffs' series. But the relevance of that, if any, has to do with the protections that plaintiffs are entitled to with respect to their protected dividend position. And it is certainly apparent from the same *pro formas* that 1981 is not a period of imminent insolvency for either of the partners to

this transaction; that the possibility of default by Penn Central, if there be any, is a long, long, long way from now; and the information to be gleaned from 1980 or 1981 dividend coverage tests or liquidation coverage tests would strike me as no more likely to be informative than projections by the respective boards of directors as to what the income would be that would be likely to be generated by these two enterprises combined into one in years to come.

It may indeed, I would add parenthetically, mean that my legal conclusion suggests that it was an error of law to permit the expert testimony. I prefer to think that the admission of the testimony and the enlargement of the record in these various respects may have performed some useful function in tending to help sharpen the focus on what issues ultimately are issues open to judicial examination and what are not.

I would close this aspect of the discussion simply by adding that defendants for their part have urged—without giving up their objection to any arithmetic as bearing on the judgment of the matters of law to be made—have urged the greater relevance of another test, the so-called "incurrence" test, which is a figure developed by dividing *pre*-tax income for the two companies by the aggregate preference of the two series, the one existing and the one proposed; and that calculation taken for the first six months of 1981 produces a figure of 4.4 or a ratio, that is to say, of 4.4 to 1. That number may not spring out to the uninitiated as an exciting number one way or another but its bearing in this litigation is simply this: The testimony adduced by defendants shows that the Marathon negotiators sought in developing the Marathon transaction to include in the guarantees to be made to the first series preference stock a 200 percent coverage or ratio of 2 to 1 based on such a test and the suggestion is made that (a) that that request for an economic test, an economic security for the first series preference, was rejected by Penn Central in the Marathon negotiations, *ergo* the point is that there is no ground for inserting by implication any economic test to validate

the proposed transaction, but (b) that if an economic test were thought worth looking at at all, it is of interest that the test rejected by Penn Central as a protection for the Marathon entrants who became the first series is more than lived up to by the proposed Colt transaction.

This latter demonstration is relevant to the extent, and only to the extent, that we move from an examination of the syntax of section 5(d) to an explication of what it must have been intended to do by some scrutiny of the events surrounding the development of 5(d), that is to say, moving out of the language of the essentially contractual relationship to its genesis. I will come to that in one second, but before turning to that I will simply complete what I have to say about 5(d) taken as a matter of text by saying that the second two-thirds vote provision contained in 5(d) which I have mentioned but have not examined strikes me as entirely inapposite. I am talking about the language which proscribes any change which "would adversely affect the first series preference stock but would not adversely affect each other series of preference stock."

That I deem to be inapposite because that, it seems to me clear from the logic of the language, was intended to prevent discriminations among outstanding series and since there is at present only one series, there is nothing which can constitute a discrimination.

Turning then from the text of 5(d) to its genesis, I find from the testimony no ground for concluding that Mr. Terry and his colleagues completed the Marathon transaction with a clearly focused lively expectation that they would be protected against the issuance of a further preference series of equivalent standing or, to be more specific, of a second and further series which might have the particular characteristics of the proposed second series to emerge from the Colt transaction.

It is apparent that Mr. Terry, after initially, and with some reluctance, joining in the view that Mr. Dicker should seriously

inquire into the Colt transaction's possibilities then changed his mind later on in the summer of 1981 and in August and in September he voted against the transaction. It is apparent from the testimony that this was not an opposition which was at least with any clarity grounded in legal norms until somewhere between the August and September meetings when Mr. Terry met with his attorneys.

"Is it a fact," Mr. Terry was asked on page 134 of his testimony, "that it wasn't until September 23 that you ever expressed the position that you were entitled to a class vote?

"It was at the board meeting in September.

"Previously when you were told that Penn Central was entering into a letter of intent and when you were told that they were negotiating a final agreement, you had expressed business reservations concerning this transaction?

"I have.

"And was it not until September 23 that you discovered that you had negotiated in 1979 for a class vote on the issuance of a parity preferred, that is, when you discovered it?

"I discovered it sometime in the interim time after I sought the advice of counsel.

"And it was counsel's advice, without prying into it, that led you to assert this position that you had a right to a class vote?

"That's right."

Obviously, it is not my submission that Mr. Terry should be held to the standards, whether more or less illuminating it's unnecessary for me to determine, of a lawyer in considering what his rights are. But it is apparent that he did not perceive the issue as one of legal entitlement until very late on in August, September of this very year.

Moreover, although he may, as apparently he did, have expressed those legal reservations at the September meeting to his fellow board members, he was not so confident of his ground or so clear on his obligations as a director to so characterize his objections in the proxy statement going out to shareholders to whom he owes a substantial directorial obligation, both the members of his own series and other shareholders.

Moreover, there does not even seem to have been a common perception among the Terry/Hunt group of their entitlements since Mr. Woodfin, though opposed in August to the transaction, supported the majority in September, apparently not persuaded by Mr. Terry's wisdom, either business wisdom or legal wisdom, with respect to the proposed transaction.

Finally, with respect to the genesis of the transaction, I would point out that the view that 5(d) was intended to confer on the first series protection against the issuance of an equivalent series is not squareable with the record of the negotiations as testified to by Messrs. Keevil and Tate and most especially reflected in defendants' exhibit 51 in which Mr. Woods, Mr. Keevil's colleague at Lazard Freres, then representing the Marathon group, proposed to Penn Central that there be the following protection: "Without the affirmative vote of two-thirds of the outstanding $5.52 convertible special preference stock—" [Let me insert in brackets here that the number "$5.52" declined as the negotiation was completed]—"Without the affirmative vote of two-thirds of the outstanding $5.52 convertible special preference stock, the company may not (a) modify or affect adversely the voting rights or preferences of such stock or (b) authorize or create any class or stock ranking equal or prior with respect to rights, dividends or the distribution of assets in liquidation."

As Penn Central had rejected the "incurrence" test, so they rejected any limitation on the issuance of an equivalent class or series of shares. So I conclude that the genesis of 5(d) confirms my reading of the text taken as a discrete contractual arrangement and that the claims made by plaintiffs on the basis of 5(d) are unsupportable in law.

In deference to the reporter and perhaps in deference to all the rest of you, I suggest we take a five-minute recess and then I will try to be brisker about developing the rest of this.

(Recess).

THE COURT: I must confess that I had expected that when I returned there would be nobody in this room at all.

■ The second basis for the first count has reliance on section 804 of the New York Business Corporation Law. I think that provision, it is abundantly clear, is inapplicable. The business corporation law is explicit with respect to what provisions are applicable to the category of foreign corporations doing business in New York and, though it is asserted in the opening section of the statute that the statute is applicable to the entirety of—is generally applicable to foreign corporations doing business in New York, there is specific delineation within the statute at section 1319 as to which provisions are to be applied and it is evident that the provisions with respect to the voting of shareholders of foreign corporations are not among those provisions identified by section 1319. The provisions are plain in that respect and Mr. Hornstein's commentary at pages 472–473 of McKinney's Consolidated Laws of New York Annotated, Book 6, distinguished the groups that are applicable to foreign corporations and those which are not. These are not.

■ Indeed, to the extent that my analysis is useful, it is apparent to me that the legislature in section 907(d) made it plain that, with respect to mergers or other transactions to which foreign and domestic corporation were parties, matters relating to foreign corporations were to be referred to the law of the state of incorporation.

The truth is that the judge sitting in Nassau County Court, Mr. Justice DiPaola in the *Scarpinato v. National Patent Development Corp.* case, 75 Misc.2d 94, 347 N.Y. S.2d 623, in 1973 did suggest that the provisions of the New York Business Corporation Law was applicable to a Delaware corporation to the extent that those provisions called for board action and no such showing had been made. Given that Justice DiPaola also made the same observation that there was a requirement under Delaware corporate law of the same action, one can only say that the observation about New York law was dictum, but beyond that it was dictum within dictum since Justice DiPaola in the previous paragraph had already found a ground for denying plaintiff's claim.

Suffice it to say that, to the extent that Justice DiPaola relied at all on the New York Business Corporation Law, he did not examine the provisions which seem on their face to exempt foreign business corporations from regulation by New York with respect to shareholders' votes. The opinion is simply silent on that matter and one can only suppose that the issue was not brought to his attention.

So I find no basis for following *Scarpinato* in that respect. That determination as to what New York law would call for had it any remote applicability in its own terms obviates any need to consider the choice of law problem involved if it were supposed that New York and Pennsylvania law were incompatible with one another in these respects.

■ The duty that lies before me, of course, is not to consider what law I would apply if I were sitting in the Nassau County Court but what law I would apply if I were sitting in the Philadelphia Court of Common Pleas. Cast as I am in the role for this diversity purpose of being a Pennsylvania judge, I am bound to apply the conflict rule which would be found applicable by a Pennsylvania court; and I see no reason *a priori* to suppose that a Pennsylvania judge would look to the law of New York rather than to the—that is, to the substantive law of New York rather than to the substantive law of Pennsylvania, which is the state of incorporation of PCC. So that if one were pushed to make that determination of how the choice of law issue would be resolved, how it would be resolved were it presented to a Pennsylvania judge, I think one can fully anticipate that a Pennsylvania judge would have no interest at all in any claimed applicability of New York law. But, as I've said, I think that interesting question need not be reached because it is clear to me that New York law makes no claim to application to this issue.

I turn now to the second and third counts, and with some hesitancy I have decided to group them together in my discussion because both of them turn very heavily on an examination of the Pennsylvania Business Corporation Law as it relates to mergers and other consolidations and purchases of assets and the effects of such transactions on the entitlements of shareholders.

The claims made under counts two and three by the plaintiffs are of two sorts. First, the claim is made that the transaction with Colt is one which entitles the members of the first series preference to the exercise of appraisal rights. The second assertion is that there is an entitlement to a majority, an absolute majority, vote of the entire class of Penn Central shareholders. These two claims, which are distinct, are each founded on the statute and are also independently founded, plaintiffs make it plain, on the doctrine of *de facto* merger developed by the Pennsylvania courts. The independence of these legal claims, that is, the independence of the statutory from the case law claim, is one that I was not certain of as I followed the development of the case, but it is apparent to me from the recital by plaintiffs on page 13 of their reply memorandum that, indeed, the *de facto* merger doctrine is an independently founded basis for their claims.

I want to address first the statutory argument. Under count two the statutory claim rests on section 1908(A) of chapter 15 Pennsylvania Statutes: "If any shareholder of a domestic corporation which becomes a party to a plan of merger or consolidation shall object to such plan of merger or consolidation and shall comply with the provisions of section 515, such shareholder shall be entitled to the rights and remedies of dissenting shareholders therein provided, if any."

The submission is made by plaintiffs that PCC is "a party to a plan of merger or consolidation" within the meaning of 1908(A). Essentially, that argument rests on the demonstration, which can hardly be controverted, that the literature surrounding the Penn Central/Colt transaction is suffused with explanations that this is a "merger" which—a merger of Colt into Holdings—which Penn Central is approving and adopting. That expression or variants of it is common throughout the material and it is that real life perception which is the basis for plaintiffs' claims under 1908(A).

Similarly with respect to their claims under the third count which relate to section 1902(B) and (C): "Except in cases where the approval of shareholders is unnecessary under section 902.1 of this act, the board of directors of each domestic corporation, upon approving such plan of merger or consolidation, shall, by resolution, direct that the plan be submitted to a vote of the shareholders of such corporation entitled to vote thereon at an annual or special meeting of the shareholders."

(c) recites: "The plan of merger or consolidation shall be approved upon receiving the affirmative vote of the shareholders entitled to cast at least a majority of the votes which all shareholders are entitled to cast thereon of each of the merging or consolidating domestic corporations. . ."

The argument based on the statute from the point of view of the statute taken as a whole runs into what I regard as insurmountable syntactical difficulties when the relevant statutory materials are taken as a whole. The phrase "plan of merger or consolidation" does not exist alone and separate and apart from other provisions of the statute. We find, for example, the language of section 1907: "Upon the merger or consolidation becoming effective, the several corporations parties to the plan of merger or consolidation shall be a single corporation which, in the case of a merger, shall be that corporation designated in the plan of merger as the surviving corporation, and, in the case of a consolidation, shall be the new corporation provided for in the plan of consolidation."

To square that with the arrangements so precisely described in the proxy materials here would require heroic feats. It is Holdings which is designated as the surviving

corporation. Yet to force Penn Central into the role of being a party to the plan of merger would either mean that Penn Central, the materials to the contrary notwithstanding, takes Holdings' place as the surviving corporation or that Penn Central disappears, which I think would be as much of a surprise to the plaintiffs as to the defendants.

The difficulty of syntax I think could be illustrated by several other provisions, but one in particular I think is of importance. The very language of 1902, which section is relied on by plaintiffs under count three as generating the requirement of shareholder approval, is illustrative. "The board of directors of each of the domestic corporations which desire to merge or consolidate shall, by resolution adopted by each board, approve a plan of merger or consolidation, as the case may be, setting forth," and then various things down to subparagraph 4: "The manner of converting the shares of each corporation into shares or other securities or obligations of the surviving or new corporation, as the case may be, and if any of the shares of any of the corporations which are parties to the plan are not to be converted solely into shares or obligations of the surviving or new corporation, the amount of securities of any other corporation or cash which the holders of such shares are to receive in exchange for such shares," and so forth.

Again, relating that language to the transaction that is before us, it seems clear that the "other corporation" is exactly Penn Central, and so that only Holdings and Colt fall within the rubric of the domestic corporations which desire to merge or consolidate.

One can only get so much mileage out of that kind of verbal exposition. My point, simply, is that it would require, it seems to me, major surgery or at least the elaborate bending of words of conventional understanding to include Penn Central within the meaning of 1908(A) or 1902, but that perhaps shouldn't end the inquiry. I think one is forced to ask whether there is a reason why the statutory framework which I have only sampled would not be intended to include Penn Central. Why should the statute be written and read as not establishing Penn Central which, clearly, is the pivotal force in this activity, as a "party to the plan of merger"?

I think there is a reason why Penn Central is not to be shoehorned into the statute. The reason is that the kind of transaction which is at the heart of this litigation is a triangular merger which is a form of business arrangement which was not intended to bring all three entities into the statutory network.

What is a triangular merger about? Well, the purposes of triangular mergers are set forth in various places. A good discussion is to be found in 57 *Virginia Law Review* 1242, *et seq.*

"A straight three-party merger involves a parent corporation, the acquirer; its subsidiary, which may be a shell formed for the purpose of completing the acquisition, and capitalized solely with the stock of the parent; and a target corporation, the corporation to be acquired. Using the stock of the parent as consideration, the basic merger is consummated between the subsidiary and the target, with the subsidiary surviving."

The discussion goes on to point out that the use of a merger has very important tax advantages which other forms of acquisition do not get the benefit of; that I.R.S., as an initial matter, found that three-party mergers or triangular mergers did not get the benefit of those advantages; but Congress came along and resurrected the tax advantage accruing to three-party mergers.

"The net result of these state and federal statutory revisions was to allow parties in a three-party merger to use the stock of the parent corporation in a tax-free reorganization. As will be demonstrated below, the three-party merger thereby became a viable, and often desirable, alternative to traditional acquisition techniques."

The writer goes on to say: "If a statutory merger can be consummated between a wholly-owned subsidiary of an acquirer-parent and a target, the acquirer-parent can

gain control of the target without incurring separate liability for its debt. Thus, by utilizing the three-party merger technique, the acquirer can avoid a major disadvantage of the traditional merger form, while maintaining the favorable tax treatment accorded mergers," quoting from page 1244.

Relating that development of the use of three-party mergers to this transaction, it is, of course, clear that prospective tax advantages have been very important to Penn Central throughout, starting with its interest in making acquisitions for the use of its loss carry forward. Beyond that, as Mr. Dicker's testimony makes plain, it was important to Penn Central to make an acquisition without increasing its own liabilities, and the liabilities of Colt are to become liabilities of Holdings and not Penn Central.

Now, the development of three-party mergers or "Jerrold"-type mergers as they have come to be known because in recent times the most celebrated early example in 1967 was so named—took its impetus from 1967 legislation in Delaware. The Delaware provision was quickly followed, as the *Virginia Law Review* notewriter points out, by statutes contemplating three-party mergers in many other states, among these Pennsylvania.

The reference to the Pennsylvania legislation is to section 1902(A)(4), the very language which I have referred to which distinguishes between "other corporation" and "the parties to the plan of merger or consolidation." The learning of the anonymous notewriter in *Virginia* is confirmed by the extended analysis by Mr. Zeiter in *Dickinson*, volume 74, page 1 *et seq.*. "A comparison of the Pennsylvania Business Corporation Law and the new Delaware Corporation Law in light of the 1968 revision of the Pennsylvania law." Mr. Zeiter confirms that 1902(A)(4) was, as he said, "derived substantially verbatim " from the then current text of GCL sections 251(b)(4), 252(b)(3) of the Delaware code. I am quoting from footnote 165 of Zeiter's article on page 29. The provision to which Mr. Zeiter and the notewriter were referring was passed in 1968 by the Pennsylvania legisla-ture as part of its comprehensive act number 216 which Zeiter exhaustively analyzes.

■ Now, it is evident to me from this that one cannot find it to be inadvertent in 1902(A)(4) that a distinction is made between "other corporation" and the domestic corporations which "desire to merge or consolidate." The statutory intention, it seems to me plain, was exactly to keep a corporation in the posture of Penn Central outside the rubric of "party to a plan of merger or consolidation." For this set of reasons, I conclude that plaintiffs' reliance in count two and count three on the respective provisions of the Pennsylvania Business Corporation Law, 908(A) and 1902(A)(4), is misplaced.

Now, plaintiffs, in the alternative, rely on the *de facto* merger doctrine as especially reflected in *Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25. I will not here try to recapitulate the remarkable ballet played by the courts and the legislature of Pennsylvania. Suffice it to say that *Farris* represented a rejection by the Pennsylvania Supreme Court of an attempt by the legislature at the instance of the corporation committee of the Pennsylvania Bar Association to legislate out of existence a series of Pennsylvania cases in the state and federal courts maturing in *Bloch* which gave dissenters' rights to the purchaser, a shareholder in the purchaser, as well as previous cases have done to a shareholder in the seller in what was characterized by the courts as a *de facto* merger, the purchasing by one corporation of another.

The Pennsylvania legislature responded again at the behest of the Pennsylvania Bar Association by a further attempt to legislate out of existence the doctrine at least as matured in *Bloch* to the point of passing a statute in 1959 which was characterized in its statutory language as, among other things, an attempt to abolish the *de facto* merger doctrine. That was done apparently with the thought that that would communicate to the Pennsylvania courts the intention of the legislature.

Now, the central position of the plaintiffs is not that there was not a legislative re-

sponse to *Farris* but that the legislative response was a narrow and limited one addressing the particular issue in *Bloch* and that it was attempting to make a particular form of dissenters' rights available in the particular kind of circumstances which *Bloch* might be thought to involve.

Now, what the legislature did in response to *Farris* was to amend 311(F) and what was at the time 908(C) so as to provide as follows: "The shareholders of a business corporation which acquires by purchase, lease or exchange all, or substantially all, of the property of another corporation by the issuance of shares, evidence of indebtedness or otherwise with or without assuming the liabilities of such other corporation shall be entitled to the rights and remedies of dissenting shareholders provided in section 515 of this act if, but only if, such acquisition shall have been accomplished by the issuance of more than a majority of the voting shares of such a corporation to be outstanding immediately after the acquisition." This language of section 311(F) which legislated a limited dissenting right was linked with comparable meshing language in section 908(C) which was to provide: "Where a corporation acquires assets by purchase, lease or exchange, by the issuance of shares, evidences of indebtedness or otherwise, with or without assuming liabilities, other than by the procedure of a merger or consolidation prescribed in this article 9, the rights, if any, of dissenting shareholders shall be governed by section 311 and not by this section 908,"—that is to say, by the very language of 311(F) to which I just referred and 908(C) was in due course to become 908(B) as we know it today.

Now, can it be in the face of that history that plaintiffs are right in saying that the *de facto* merger doctrine survives or is, indeed, codified in Pennsylvania law apart from the particular accommodation which was made by the legislature to the Pennsylvania Supreme Court by providing for a limited dissenting right on behalf of purchasers, shareholders of the purchaser corporation where there was being issued by the purchaser shares in excess of what was required to elect a majority of the board of directors? I cannot find plaintiffs' position in this respect persuasive. Most compelling seems to me what the Pennsylvania legislature did again in 1968 at the same time that it added the language in 1902(A)(4) to which I had adverted.

Section 1005(E) was added in 1968 and remains the law today in the following terms: "Notwithstanding subsection (a) of this section, a shareholder shall not have any right to obtain in the absence of fraud or fundamental unfairness an injunction against any proposed plan or amendment of articles authorized under any section of this act or to claim the right to valuation of and payment for his shares because of any such plan or amendment, except that he may dissent and claim payment if, and to the extent provided in section 515 of this act, where this act expressly provides that dissenting shareholders shall have the rights and remedies provided in section 515 of this act."

In the face of that express and precise and, it would seem to me, carefully drawn language added in 1968 at what seems to me the conclusion of the reforming of the Pennsylvania Business Corporation Law through a decade of activity, both statutory and constitutional, *post-Farris*, in the face of that language I cannot believe that a Pennsylvania court sitting in equity would "in the absence of fraud or fundamental unfairness" decree an entitlement to dissenters' rights. So for that reason, it seems plain to me that the *de facto* doctrine, whatever its dimensions may be now, is not spacious enough to be the predicate for the dissenter claim or, indeed, the claim to voting by absolute majority of the shareholders, advanced by plaintiffs under counts two and three.

To be sure, there is no exact analogue for 1005(E) as it relates to voting rights but I think, again taking the structure of the statute taken as a whole, one would have to conclude that, "in the absence of fraud or fundamental unfairness" the Pennsylvania courts would not, by judicial intervention, find an entitlement to dissenters' rights or

to voting rights not to be found in the statute itself.

As I have made more than plain, I am afraid, at too great length, the statute by itself does not seem to me to give comfort to either argument. (I must add, of course, that there is no claim in this case of fraud—except in the ultimate sense that it is asserted that the proxy materials misrepresent, because they are based on faulty legal premises—there is no claim that this is a transaction which is fraudulently disparaging of the rights of the first series preference stock or of anybody else; and much that is involved in the Pennsylvania cases which I have not canvassed that led up to *Farris* is very much oriented toward that fraudulent beginning. Nor do I find anything remotely categorizable as "fundamental unfairness" in what has been undertaken).

■ Without repeating my analysis of section 5(d), I think it clear that what has been undertaken in this transaction is not in significant derogation or, indeed, literally in any derogation, of plaintiffs' entitlements.

Now, in rejecting the *de facto* merger doctrine as it would be sought to be applied by plaintiffs in this case, I have not ignored the cases which plaintiffs have relied on, *In Re: Jones & Laughlin*, 488 Pa. 524, 412 A.2d 1099 (1980), in the Pennsylvania Supreme Court; Judge Adams' decision in *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (Third Circuit 1974), and Chief Judge Lord's decision in *In re: Penn Central Securities Litigation*, 367 F.Supp. 1158 (E.D.Pa.1973), here in this court.

Suffice it to say that *Jones & Laughlin* is a case in which the question of fraud was an ingredient and *Farris* was referred to by the Supreme Court of Pennsylvania in noting the relevance of fraud antecedent to the statutory language to which I have referred. That doesn't seem to me to offer any independent ground for saying that *Farris* in the broad sense contended for by plaintiffs still walks abroad in the Commonwealth.

Chief Judge Lord's case was also, in a sense, a fraud case but, in any event, it was an exposition of 10(b)(5) and it was a determination of standing under federal law—standing which the Chief Judge quite properly found not to be circumscribed by the mere forms of corporate arrangements and re-arrangements. And, finally, the Third Circuit's case is one which, indeed, utilizes *Farris* and cases antedating *Farris* to assist it to reach its result of piercing, if you will, the corporate demise or resuscitating a deceased corporation—but, for a purpose entirely unrelated to what we have here. The question there was one of essentially the survivorship of tort liability and one would certainly hope that courts would look to that issue in an entirely different way from the analysis that goes to determining the rights of shareholders to dissent and to vote.

The distinctness of the problems is, I think, made clear in a little article by Winthrop in 6 *Securities Regulation Law Journal* 195 written in 1978, entitled "Structuring a Corporate Acquisition to Avoid the De Facto Merger Doctrine." Mr. Winthrop is addressing the very sort of question which the Third Circuit was addressing, though I believe principally with other cases, and he noted the distinctness of *Farris* as it related to questions of the entitlement of shareholders.

(Now, I think it's fair to say parenthetically that Mr. Winthrop in his brief reference to *Farris* seemed to suggest that it had or might reasonably be found to have a larger continuing life in its own domain than I find it to have, but to the extent that Mr. Winthrop is suggesting that rather than simply making plain the difference between two sets of problems, I am rejecting Mr. Winthrop's wisdom).

What have we ultimately concluded then? That triangular mergers are a device of considerable utility in the business world and have been pursued actively, especially since 1967 and the change in the Delaware Corporation Law followed by comparable changes in other states, including Pennsylvania.

Whether the policy of denying rights of dissent and rights of voting participation with respect to transactions of the sort contained in the Penn Central/Colt arrangement—whether that is good policy or bad is, I suppose, beyond the proper purview of a court, especially a court which, sitting in diversity, is merely meant to emulate, as best one can, what can be expected in the Pennsylvania courts. Obviously, there are wide differences of opinion as to the utility of devices such as appraisal rights in whatever range they properly obtain. One needs to compare, for example, the writings of Dean Manning, former Dean Manning, back when he was a mere professor, in 72 *Yale* with the subsequent writings of his sometime colleague, Professor Deutsch, in volume 20 of *Villanova.* Those very, very challenging perceptions of both students are surely outside my proper purview. What I think is within my proper purview is simply to point out in the closing of this aspect of my opinion—and I hasten to add there are not many more aspects—that there is a coherent set of reasons for denying the sorts of entitlements asserted by plaintiffs in this proceeding and that set of reasons, whether one agrees with them or not, are voiced again in the note in *Virginia* to which I have referred before.

I now quote from pages 1244 to 45 of volume 57 of the Virginia Law Review. "A more important problem with the traditional merger form is that statutes normally require that proposed mergers be approved by vote of the shareholders, and that those who oppose the plan be given appraisal rights. The necessity of submitting a plan to shareholders for approval is always inconvenient, but rarely fatal to an acquisition. The prospect of having to buy out shareholders who oppose the acquisition, on the other hand, can cause the entire transaction to be aborted. Especially when the merging corporations are illiquid, the opposition of even a small minority of one party's shareholders may have a profound effect. In order to avoid this unpleasant aspect of the traditional merger form, parties were often forced into stock acquisitions (B reorganizations) or asset acquisitions (C re-

organizations). Now, by using the three-party merger technique, the impact of voting and appraisal requirements can be substantially mitigated in a merger, thus obviating the need to resort to stock or asset acquisitions. In a three-party merger, the shareholders of the acquirer-parent are denied voting and appraisal rights, since the parent-acquirer is the only shareholder of the merging subsidiary capable of voting and dissenting. The parent-acquirer's shareholders have no voice in the merger transaction."

In the instant transaction Penn Central's shareholders are to be afforded a voice by virtue of Penn Central's view that conformity with requirements of the New York Stock Exchange is called for. That is not an entitlement that approximates at all the entitlements which plaintiffs have believed themselves entitled to. I have found plaintiffs' claim to be unwarranted either under section 5(d) of the amended articles or under the New York Business Corporation Law or under the Pennsylvania Business Corporation Law or under the doctrine, to the extent that it still has any place, of *de facto* merger in the courts of Pennsylvania.

What I have said covers the first three counts in plaintiffs' complaint. The fourth count is essentially merely recapitulatory of the claims under the first three counts, asserting that if there is validity in any or all of those claims, then the proxy materials are misleading.

Since I have concluded that there is no merit in any of the first three counts, I also conclude that there is no merit in the fourth count and, accordingly, for the reasons that I have recited at such very great length and with apologies to my very patient audience, I shall enter an order denying the relief requested by the plaintiffs and dismissing the complaint. That order will be entered tomorrow.