624 F.2d 1384
 CITY OF JACKSON, MISSISSIPPI, a Municipal Corporation,
Plaintiff-Appellant,
United States of America, Plaintiff-Intervenor-Appellant,
v.
FILTROL CORPORATION, a Delaware Corporation, Defendant-Appellee.
 No. 78-3006.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 29, 1980.
 
 Brunini, Grantham, Grower & Hewes, Newt P. Harrison, Lawrence E. Allison, Jr., Howard C. Ross, Jr., City Atty., Jackson, Miss., for plaintiff-appellant.
 Robert E. Hauberg, U. S. Atty., L. K. Travis, Asst. U. S. Atty., Jackson, Miss., Joshua I. Schwartz, Carl Strass, Atty., James W. Moorman, U. S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for plaintiff-intervenor-appellant.
 Watkins & Eager, William E. Suddath, Jr., John L. Low, IV, Jackson, Miss., for defendant-appellee.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before BROWN, HENDERSON and SAM D. JOHNSON, Circuit Judges.
 SAM D. JOHNSON, Circuit Judge:
 
 
 1
 This is an appeal from a diversity case, Mississippi law controlling, brought by the City of Jackson, Mississippi (the City) against Filtrol Corp. for additional costs that the City incurred in constructing a sewer line on its right-of-way over Filtrol's property and some property adjacent to Filtrol's.[1] The City alleged that it incurred these additional costs because Filtrol had contaminated its property and the adjacent property with a concentration of sulfuric acid high enough to corrode ordinary cement sewer pipes. At the close of the City's evidence, the district court directed a verdict for Filtrol on a variety of grounds.
 
 I. The Facts
 
 2
 In 1936 Filtrol began operations at its Jackson plant to process bentonite clay into a powder that it used to purify petroleum and vegetable oils. As a part of the process, the clay is washed in a sulfuric acid bath. After the sulfuric acid bath, a water bath removes the acid from the clay. The water bath produces an effluent that is ninety-five percent water, four percent electrolytes, and one percent sulfuric acid.
 
 
 3
 In 1943 Filtrol built several concrete ponds on property that it owned outside the Jackson City Limits. Filtrol used these ponds to hold the effluent from the water bath when the water level of the nearby Pearl River was low. Filtrol would discharge the effluent from the Ponds when the river's level rose high enough that the discharge of effluent would not significantly lower the river's pH.[2] The City produced evidence at trial that one of the Filtrol ponds, Pond No. 4, began to leak on the first day in 1943 that Filtrol channeled effluent into it. The pond leaked at a very slow rate, but for a long period of time. Sometime around 1954 or 1955, the area where the City eventually laid its sewer pipe became so contaminated with acid that its pH was only 2.5.
 
 
 4
 In 1960, the City began an area wide sewage treatment project that required the construction of a 96 inch diameter concrete collector pipeline. This pipeline is called an interceptor line because it was designed to travel along the Pearl River and intercept all the other lines that had dumped raw sewage into the river. The interceptor line was designed to be gravity fed so it had to follow the downhill contours of the area topography. These downhill contours dictated that the pipe go through Filtrol's property and some adjacent property belonging to the Ridgeway family.
 
 
 5
 In 1971, twenty-eight years after Filtrol's Pond No. 4 began to leak and seventeen years after the subsoil in the area had already become contaminated with sulfuric acid, the City approached Filtrol to acquire an easement for its sewer line. Filtrol voluntarily agreed to grant a sewer easement to the City for the same amount that all the other landowners received, $1.00 per lineal foot. In addition to paying $2,518 for the easement over Filtrol's property, the City agreed to indemnify Filtrol from all losses arising out of the presence of the interceptor line on Filtrol's property. At around the same time the City acquired the easement from Filtrol, it also acquired an easement to construct the interceptor line over the Ridgeway property adjacent to Filtrol's property. At the time these easements were executed, no one knew, at least as far as the facts in the record show, that the soil in the easements had been contaminated with acid.
 
 
 6
 To construct the interceptor line, the City began excavating dirt so it could lay the sewer pipe twenty-five to thirty feet below the surface. Large quantities of subsurface water complicated the excavation. To prevent the collapse of the walls of the ditch it was digging for the sewer pipe, the City had to dewater the ditch by pumping out the subsurface water. The dewatering pumps failed repeatedly. The City investigated and determined that sulfuric acid in the subsurface waters had corroded its pumps and caused them to fail. The City's investigation revealed that Filtrol's Pond No. 4 was the source of the acid in the subsurface soil.
 
 
 7
 Concrete pipe, according to the evidence at trial, will corrode in a pH of less than 5.5. The City could not reroute its interceptor line to avoid the contaminated soil, so it had to protect the concrete pipe from the acid with an asphalt coating. The City coated 1,158 feet of pipe that lay in the easement on Filtrol's property and 373 feet of pipe on the Ridgeway property. Further downstream where the soil was not as contaminated, the City packed 302 feet of pipe on the Ridgeway easement with a compacted clay backfill.
 
 
 8
 The City claimed it spent almost one-half million dollars to protect its sewer pipe from the acid. It sued Filtrol in state court on a variety of grounds. Filtrol removed to federal court on the grounds of diversity, and the federal district court ordered a bifurcated trial on damages and liability. At the close of the City's evidence in the liability phase of trial, the district court granted Filtrol's motion for directed verdict. It relied heavily on an indemnity agreement between Filtrol and the City. On appeal, the City claims it made a showing of Filtrol's liability sufficient to withstand a directed verdict on four separate bases of recovery in tort: nuisance, strict liability, negligence and trespass. The City also claims that the district court erred in entering judgment against it because of the indemnity agreement between it and Filtrol.
 
 II. The Indemnity Agreement
 
 9
 The easement that Filtrol granted to the City provides in part as follows:
 
 
 10
 The grantee City of Jackson shall indemnify and save harmless the Filtrol corporation from any and all loss resulting from any damage to person or property arising out of or resulting from or in any manner caused by the location, construction, operation and maintenance and presence of said City of Jackson, Sanitary Sewer Main, upon and across . . . the Filtrol Corporation's easement . . . .
 
 
 11
 The district court held that this provision barred the City's recovery against Filtrol. On appeal, Filtrol makes a refreshingly candid concession. The indemnity provision can only hold Filtrol harmless from the damages incurred by the City in constructing the interceptor line on the easement granted by Filtrol. Filtrol concedes that the indemnity provision cannot apply to the additional costs the City incurred to protect the interceptor line from corrosion in its easement over the Ridgeway land.
 
 
 12
 The City contends that the indemnity provision does not apply to the facts of this case, even on the Filtrol property. Even a cursory reading of the provision indicates that the contrary is true. The City agreed to hold Filtrol harmless from "any and all loss . . . arising out of . . . the location . . . (of the) sewer main upon . . . the Filtrol Corporation's easement . . . ." The City brought suit for damages it incurred because it had to locate the sewer line in contaminated soil on the Filtrol Corporation's easement. This is a loss arising out of the location of the sewer main on the easement. The indemnity provision clearly applies. The City cannot profit from the fact that Filtrol, when it drafted the indemnity provision, did not specifically foresee that the provision would apply to the facts of this case. Filtrol drafted, we can assume, a broad indemnity provision so that it would be protected from liability even in difficult to foresee circumstances.
 
 
 13
 The City next contends that the indemnity provision is not clear and unequivocal enough to protect Filtrol against the consequences of its own negligence.[3] At least at one time, the majority of jurisdictions strictly construed indemnity contracts so that broad, all-encompassing language of indemnification did not indemnify an indemnitee against loss caused solely by the indemnitee's own negligence. See United States Fidelity & Guaranty Co. v. Mason and Dulion Co., 274 Ala. 202, 145 So.2d 711, 713 (Ala.1962); United Gas Pipeline Co. v. Gulf Power Co., 334 So.2d 310 (Fla.App.1976); H. McNeal, Indemnity A General Review 21 (1963). Instead, the courts frequently would require the indemnity provision to expressly provide that it applied to losses caused solely by the indemnitee's own negligence.
 
 
 14
 This, however, is not the law in Mississippi. In Blain v. Sam Finley, Inc., 226 So.2d 742 (Miss.1969), the subcontractor, Finley, agreed to fully indemnify and "save harmless (the) contractor (Blain) from all such claims for damages and from all expenses and attorney's fees incident thereto, arising out of or in anywise connected with the subcontract work." An employee of Blain was killed when his automobile struck a parked asphalt spreader that was under the exclusive control of the subcontractor, Finley. The employee's representative sued Blain and Finley, and lost. Blain then sued Finley to recover the attorney's fees and costs it had incurred in defending the employee's suit. The Court first noted that indemnification for attorney's fees follows the same rules as indemnification for other damages. It stated that the parties to an indemnity contract must clearly and unequivocally express their intent to indemnify one against the consequences of his own negligence. The Court then held that the indemnity provision quoted above was "broad enough to indemnify Blain against his own negligent acts . . . ." Id. at 746. In Mississippi, broad language of indemnification is clear and unequivocal enough to protect an indemnitee against the consequences of his own negligence.
 
 
 15
 The indemnity provision in the instant case is as broad as the indemnity provision in Blain. It is, therefore, sufficiently clear and unequivocal to indemnify Filtrol against the consequences of its own negligence. The City attempts to distinguish the instant case from Blain on the ground that in the instant case the tortious acts of the indemnitee have injured the indemnitor instead of some third party to whom the indemnitor was held liable. This fact does distinguish Blain from the instant case, but the City offers and this Court perceives no reason for this distinction to make a difference in the result. Indemnity provisions allocate ultimate liability for a loss between the indemnitee and the indemnitor. Whether the indemnitor or some third party suffered the original loss, liability for which the indemnity provision will allocate, should make no difference.
 
 
 16
 The City next contends that the indemnity provision in this case is void under a Mississippi statute enacted in 1972. That statute provides that
 
 
 17
 With respect to all public or private contracts or agreements, for the construction, alteration, repair or maintenance of buildings, structures, . . . sewer or gas distribution systems, or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise and/or agreement contained therein to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable.
 
 
 18
 Miss. Code Ann. § 31-5-41 (Supp. 1978). This statute does not apply to the City's agreement to indemnify Filtrol. Filtrol granted the City an easement so that the City could construct a sewer line. The easement was not an agreement for or dealing with the construction of a sewer line. The statute appears directed to contracts in which one party actually undertakes to construct, repair, or maintain a structure or sewer system. If, after taking the easement, the City decided not to construct the sewer line, Filtrol would not have a claim for breach of the easement with the City. The easement is not a contract in which one party agreed to construct a sewer.
 
 
 19
 Finally, the City contends that Filtrol's actions in allowing its effluent to contaminate the subsurface sands were illegal under Mississippi law and that Filtrol cannot indemnify itself against the consequences of an illegal act. The City claims that Filtrol acted illegally under the Mississippi Air and Water Pollution Control Law, Miss. Code Ann. § 49-17-1 et seq. This law was not enacted until 1972, however. Filtrol's acts were therefore not illegal at the time they were performed. Furthermore, an agreement "to indemnify against the consequences of an illegal act already committed is . . . valid, unless there was an understanding prior to the commission of the illegal act that subsequently indemnity should be given . . . ." 15 Williston on Contracts 139 (1972) (footnote omitted). The City cannot avoid its agreement to the indemnity provision on the ground that indemnification against an illegal act is void.
 
 
 20
 Rejecting all of the City's challenges to the indemnity provision in this case, we hold that the provision bars the City's recovery against Filtrol for damages incurred on a portion of the sewer line that lies on the right-of-way granted by Filtrol to the City.[4] As discussed above, Filtrol has conceded that the indemnity provision can only apply to that part of the City's cause of action for damages incurred on the Filtrol easement. The remaining discussion in this opinion will apply only to the City's recovery of damages incurred in protecting the sewer line on the Ridgeway property.
 
 III. Nuisance, Trespass, and Strict Liability
 
 21
 The City argues that it produced sufficient evidence to hold Filtrol liable on three separate theories: nuisance, trespass, and strict liability. Our examination of Mississippi law indicates that on the facts of this case nuisance, trespass, and strict liability are not separate theories of liability. Mississippi allows a plaintiff damaged by a physical invasion to its land to recover upon a simple showing that the defendant was responsible for the physical invasion. Here, the City offered sufficient evidence from which the jury could reasonably have concluded that Filtrol was responsible for a physical invasion of the City's land. Without disputing this fact, Filtrol argues that the prior trespass doctrine in Mississippi law bars the City's recovery. The prior trespass doctrine, we conclude, does not apply. Accordingly, the district court erred in directing a verdict against the City on the issue of Filtrol's liability for damages incurred by the City in protecting its pipeline from the contaminated soil on the Ridgeway property.
 
 
 22
 The Mississippi courts have held defendants strictly liable for the physical invasion of a plaintiff's land in a variety of situations. In King v. Vicksburg Railway and Light Co., 88 Miss. 456, 42 So.2d 204 (1906), the plaintiff sued for depreciation in the value of his property caused by noise, smoke, soot and vibration from the defendant's adjoining power plant. The court noted that the plant's "machinery is of the best kind, its employees skillful and careful, and its management above criticism." 42 So.2d at 204. The evidence showed, however, that the plaintiff's property had been damaged by the physical invasion of the defendant's plant. This subjected the defendant to strict liability. "No owner of property may put in motion agencies which physically invade the home of another without liability for the damage done." 42 So.2d at 204-205. In the instant case, making all reasonable inferences in support of the party against whom a directed verdict was granted, Filtrol put in a motion the acid that invaded the City's property.[5]
 
 
 23
 In a more recent case, a landowner sued to recover damages to his cows caused by an overflow of the defendant's sewer into a ditch that carried the overflow into the landowner's pasture. The court stated that the landowner made out a case of absolute liability upon showing that the defendant was responsible for the sewage invading his land. Town of Fulton v. Mize, 274 So.2d 129 (Miss. 1973). The court in Mize relied on Love Petroleum Co. v. Jones, 205 So.2d 274 (Miss. 1967). There, the plaintiff recovered for damages to his land caused by oil and salt water that escaped from the defendant's oil well.
 
 
 24
 The language of the opinions in Love Petroleum and Mize indicates that the court held the defendants liable in nuisance. On similar facts, in a case decided after Love Petroleum and before Mize, the Mississippi Supreme Court held that the landowner was entitled to recover in trespass rather than nuisance. The plaintiff in Blue v. Charles F. Hayes & Associates, Inc., 215 So.2d 426 (Miss. 1968), alleged that the defendant built a slush pit to hold drilling mud, acids, refuse, lye, and lime and that the contents of the slush pit leaked over the plaintiff's land. The court held the plaintiff had stated a cause of action for trespass and then went on to distinguish nuisance from trespass. The court noted that when the plaintiff's property is not physically invaded, the cause of action is for nuisance rather than trespass. The label that a court attaches to the theory under which it holds a defendant liable does not appear to be of critical importance. Mississippi clearly allows a plaintiff to recover damages to land caused by a physical invasion of the plaintiff's land by an agency put in motion by the defendant, even if the defendant has not been negligent. The City produced sufficient evidence from which a jury could reasonably infer that it suffered damages because Filtrol's acid physically invaded the right-of-way. See also Filtrol Corp. v. Hughes, 199 Miss. 10, 23 So.2d 891 (Miss. 1945) (holding the defendant liable for damages to the plaintiff's land caused by the defendant's channeling of a fast stream of rain water on the plaintiff's land"), noted in Prosser, Law of Torts § 78 (1971).
 
 
 25
 Unlike the plaintiffs in several of the cases discussed above, the City has not sued for a decrease in the value of its property caused by the defendant's physical invasion. Instead, the City has sued to recover special damages incurred because of the defendant's invasion. The cases allow recovery of special damages. The court in City of Oxford v. Spears, 228 Miss. 433, 87 So.2d 914 (Miss. 1956), held that a landowner can recover special damages caused by a nuisance and gave as examples of special damages the following: annoyance, discomfort, inconvenience, and sickness. The court went on to state that its listing was not exhaustive and that, "(t)here may be others." In Town of Fulton v. Mize, the court stated simply that, "The injured landowner is entitled to . . . special damages as may accrue to him as a direct result of the nuisance." 274 So.2d at 131.
 
 
 26
 Thus, in the instant case, the City will be entitled to recover the costs of protecting the interceptor sewer line if it can show that those costs were incurred as a direct result of the escape of Filtrol's acid into the City's right-of-way. Of course, the City will have to show that the costs it incurred were reasonable, and Filtrol will have an opportunity to show that the City failed to mitigate its damages.
 
 
 27
 Filtrol contends that the prior trespass doctrine in Mississippi law precludes the City's recovery against it. The prior trespass doctrine provides that a purchaser of land "gets the land only and not any right of action for former trespasses." Thompson v. City of Philadelphia, 180 Miss. 190, 177 So. 39, 40 (Miss. 1937). Filtrol argues that the City's evidence showed that the property that later became the City's right-of-way was contaminated with acid in 1955. This, Filtrol argues, was a permanent condition of the land, and when the City acquired the land the prior trespass doctrine barred the City's recovery for damages caused by the prior trespass.
 
 
 28
 The rationale for the prior trespass doctrine is that a purchaser of land to which permanent damage has been done by trespass or nuisance pays less for the land because of that damage. The purchaser therefore cannot recover for the diminution in the value of the property caused by the nuisance or trespass. 58 Am.Jur.2d Nuisances § 105 (1971). (The Mississippi Supreme Court has frequently looked to American Jurisprudence Second for general principles of nuisance law. See e. g., Vicksburg Chemical Co. v. Thornell, 355 So.2d 299 (Miss. 1978); Blue v. Charles F. Hayes & Associates, Inc.) Here, the city is not suing for a diminution in the value of the right-of-way it purchased from Ridgeway; it is suing for special damages caused by Filtrol's invasion of the property it purchased. In Thompson, the court applied the prior trespass doctrine to bar recovery by the plaintiffs for any decrease in the value of land caused by the drainage of the defendant's sewer system onto the plaintiffs' land. The court, however, then went on to hold that the plaintiffs could recover special damages that they incurred because of the defendant's sewer.
 
 
 29
 The same result obtains here. Assuming that the Ridgeway land became permanently contaminated with acid before the City bought it, the City cannot recover from Filtrol the decrease in the value of the land caused by the contamination. The City can nonetheless recover the special damages it has suffered because of the contamination. This application of the prior trespass doctrine accords with the doctrine's purpose. The City cannot recover for the diminution in the value of the land because the price it paid, theoretically at least, for the land reflected the damage to the land by the contamination. The City can recover special damages caused by the contamination because the price it paid for the land did not reflect those damages.[6]
 
 
 30
 In short, the district court erred in directing a verdict against the City. On remand, to establish liability of Filtrol for its special damages, the City will have to show that it incurred those damages because of a physical invasion of the Ridgeway right-of-way by Filtrol's acid.
 
 IV. Negligence
 
 31
 The City also contends that it made out a case of Filtrol's negligence sufficient to withstand a motion for directed verdict. We decline to address this question. Filtrol's negligence, if any, in allowing acid to escape from its property is not relevant to this suit. Filtrol is liable to the City if acid escaped from its property and caused the City damage. The City need show no more to hold Filtrol responsible for its damages under a theory of strict liability. To hold Filtrol liable in negligence, the City would have to make the same showing it did for strict liability plus it would have to show a breach of duty. Filtrol would never be liable in negligence if it were not liable in strict liability. Negligence therefore drops out of the case.
 
 
 32
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The United States is in this case because it paid 55% of the costs of constructing the sewer line, and it stands to share in any judgment that may eventually be awarded to the City. The United States has adopted the City's brief in this case and waived oral argument
 
 
 [2]
 "pH" is a quantitative measure of the acidity or basicity of liquid solutions. It ranges on a scale from 1 to 14. A pH of 7 is neutral, less than 7 is acidic, and more than 7 is basic. See 7 Encyclopedia Britanica (Micropaedia) 922 (1974). Filtrol would only release the effluent in the ponds when doing so would not reduce the Pearl River's pH below 6
 
 
 [3]
 We assume for the purpose of deciding this point that Filtrol negligently contaminated the subsurface soil surrounding the City's sewer pipe
 
 
 [4]
 The district court also entered judgment against the City on the doctrine of caveat emptor. Like the indemnification provision, the doctrine of caveat emptor cannot apply to damages other than those incurred by the City on the easement that it bought from Filtrol. Because the indemnity provision bars recovery of damages incurred on the Filtrol easement, we need not address the validity of the district court's holding on caveat emptor
 
 
 [5]
 The City did not own its right-of-way at the time that property was first invaded by the defendant's acid. This is the basis of Filtrol's prior trespass defense, which is discussed later
 
 
 [6]
 The application of the prior trespass doctrine would be especially tenuous in this case when no one knew of the permanent contamination to the subsurface soil on the Ridgeway land at the time the City purchased that land. Since no one knew of the contamination, the contamination could not have influenced the price the City paid for its easement