PHILADELPHIA ELECTRIC COMPANY

v.

HERCULES, INCORPORATED

and

Gould, Inc.

Civ. A. No. 82–690.

United States District Court, E.D. Pennsylvania.

Feb. 22, 1984.

Joseph M. Donley, Robert Emmet Hernan, Kittredge, Kaufman & Donley, Philadelphia, Pa., for plaintiff.

Joseph G. Manta, Franklin & Manta, John C. Sullivan, Philadelphia, Pa., for Hercules, Inc.

Kean K. McDonald, LaBrum & Doak, Philadelphia, Pa., for Gould, Inc.

MEMORANDUM OF DECISION

McGLYNN, District Judge.

In April of 1980 the Commonwealth of Pennsylvania, Department of Environmental Resources, (DER), discovered a hydrocarbon resinous material, which it deemed to be a pollutant, on property owned by Philadelphia Electric Company, (PECO), in Chester, Pennsylvania, (Chester Site). The

DER required PECO to remove this resinous material from the property and the banks of the Delaware River.[1]

In February of 1982, PECO brought this suit claiming negligence, private nuisance and public nuisance against Hercules Incorporated, (Hercules), on the ground that Hercules' predecessor in interest, Pennsylvania Industrial Chemical Corporation, (PICCO), had caused the contamination during its operation of a petrochemical plant at the Chester Site in the period from 1945 to 1971. Since PICCO had sold the property to Gould, Inc., (Gould), in 1971, who thereafter sold to PECO in 1974, PECO's complaint also included claims of nuisance, deceit and/or misrepresentation against Gould, on the ground that Gould contributed to the contamination and/or knew of the contamination but did not disclose this condition when it sold the property to PECO in 1974.[2] Both Hercules and Gould denied the claims of PECO and cross-claimed against each other. Jurisdiction of the case was based upon diversity of citizenship between the parties. See 28 U.S.C. § 1332 (West Supp.1983). After a five day trial, the jury returned a verdict in favor of PECO[3], and in favor of Gould on the cross-claims.

■ Presently before the court are Hercules' motions for judgment notwithstanding the verdict, pursuant to Fed.R. Civ.P. 50(b), and, in the alternative, for a new trial, pursuant to Fed.R.Civ.P. 59. Generally, a jury's verdict may be set aside only if manifest injustice will result if it were allowed to stand. The court may not substitute its own judgment for that of the jury merely because the court may have reached a different conclusion. To grant a motion for judgment n.o.v., the court must find, as a matter of law, that the plaintiff failed to adduce sufficient facts to justify the verdict. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.1970), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

■ However, a motion for a new trial, unlike a motion for a judgment n.o.v., does not seek a final judgment but another trial. Thus, a motion for a new trial is within the sound discretion of the trial judge and should be granted only when the verdict is palpably contrary to the clear weight of the evidence or when a miscarriage of justice has occurred. *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 88–89 (3d Cir.1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); J. Moore & J. Wicker, 6A *Moore's Federal Practice* ¶ 59.08 (2d ed. 1983). For the reasons set forth herein, Hercules' motions will be denied.

## I. CORPORATE SUCCESSOR LIABILITY

Hercules' first argument is that the court erroneously denied its motion for summary judgment on the issue of corporate successor liability. The inquiry regarding corporate successor liability commences with Pennsylvania law, for it controls the outcome of this diversity suit. *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ The general rule in Pennsylvania is that when one corporation merely sells or transfers all of its assets to a successor corporation, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets. *Husak v. Berkel Incorporated,* 234 Pa.Super. 452, 341 A.2d 174, 176 (1975). There are, however, certain exceptions to this rule. Liability for obligations of a selling corporation may be imposed on the purchasing corporation when: (1) the purchaser expressly or im-

---

**1.** DER issued a citation against PECO on August 22, 1980 for violations of the Clean Streams Law. Pa.Stat.Ann. tit. 35, § 691.1 et seq.

**2.** At trial, PECO presented no evidence against Gould, therefore at the close of PECO's case I granted Gould's motion for a directed verdict pursuant to Fed.R.Civ.P. 50(a).

**3.** Prior to trial the parties filed cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56 on the issue of corporate successor liability. I denied Hercules' motion and granted PECO's motion holding that Hercules was the successor in interest of PICCO.

pliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability. *See Shane v. Hobam, Incorporated,* 332 F.Supp. 526, 527 (E.D.Pa.1971). A fifth circumstance, sometimes included as an exception to the general rule, is where the transfer was without adequate consideration and provisions were not made for creditors of the transferor. *See Lopata v. Bemis Co., Inc.,* 383 F.Supp. 342 (E.D.Pa. 1974); *McKee v. Harris Seybold Co., Div. of Harris-Int. Corp.,* 109 N.J.Super. 555, 264 A.2d 98 (1970). Additionally, Pennsylvania has recently adopted a product-line exception. *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106, 111 (1981); *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033 (E.D.Pa.1982).

In order to determine whether the sale of assets in this case falls within one of the six exceptions to the general rule of nonliability it will be necessary to examine the circumstances of the sale of PICCO assets. It is clear that if one of these exceptions apply, Hercules can be held liable for the acts of its predecessor in interest.[4] *Shane,* 332 F.Supp. at 527.

The contract of sale between Hercules and PICCO is entitled an Agreement and Plan of Reorganization (Agreement). After setting forth the warranties of the respective corporations, the Agreement provides in Article IV § 4.1 that PICCO was to convey:

all of its properties and assets of every kind and description as a going concern together with but not limited to cash, monies on deposit, goodwill, including the right to use of the name PICCO, customer lists, credit and sales records

and all other interests to which it has any right by ownership, use or otherwise ... ...[in exchange for 240,000 shares of common stock of Hercules[5] and] ...

(ii) The assumption by Hercules of any and all obligations and liabilities of PICCO under the various agreements, contracts, leases, licenses and other writing referred to in Article I herein, including those specifically excepted from the representations in Article I; and

(iii) The assumption by Hercules of all the debts, obligations and liabilities of PICCO as of the Closing Date, excepting therefrom the liabilities arising out of the breach of any warranty of PICCO contained herein, in any certificate or other instrument furnished hereunder, any misrepresentation by PICCO herein, or the failure of PICCO to perform under any of its agreements and contracts herein, and except liabilities of PICCO set forth in subsection (iv) for which cash is specifically reserved herein.

In light of the exceptions to nonliability for a corporate purchaser of assets, the threshold question which this court must address is whether Hercules either expressly or impliedly assumed the instant liability when it entered into this contract with PICCO.

██ A buyer of assets can avoid the implied assumption of liabilities by enumerating liabilities assumed and explicitly excluding the assumption of liabilities not enumerated. *Kloberdanz v. Joy Manufacturing Co.,* 288 F.Supp. 817, 822 (D.Col. 1968); *cf. Menacho v. Adamson United Co.,* 420 F.Supp. 128, 133 (D.N.J.1976), *citing McKee v. Harris Seybold Co., Div. of Harris-Int. Corp.,* 109 N.J.Super. 555, 563, 264 A.2d 98, 102 (Super Ct.1970), *aff'd* 118 N.J.Super. 480, 288 A.2d 585 (Super Ct. App.Div.1972). In the instant contract, however, Hercules broadly assumed all of

4. Hercules' claim that PECO brought this action beyond the applicable statute of limitations is without merit since PECO sued Hercules, not its predecessor PICCO. *See Knapp v. North American Rockwell Corp.,* 506 F.2d 361 (3d Cir.1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1955, 44

L.Ed.2d 452 (1975); Pa.Stat.Ann. tit. 15 § 2111 (Purdon 1983).

5. As a result of a subsequent stock split by Hercules, PICCO received 480,000 shares of Hercules stock which was distributed to its shareholders.

PICCO's liabilities with certain limited exceptions. Therefore, unless one of the exceptions apply, Hercules can be held to have assumed the liability at issue.

■ Citing *Neville Chemical Co. v. Union Carbide Corporation*, 422 F.2d 1205 (3d Cir.1970) and *Husak v. Berkel, Incorporated*, 234 Pa.Super. 452, 341 A.2d 174 (1975), Hercules maintains, however, that the law of Pennsylvania supports the proposition that assumptions of liability are to be strictly construed in favor of nonliability. I do not agree.

In *Neville*, the plaintiff, a manufacturer of hydrocarbon resins, brought an action against the defendant, a petrochemical company, on the basis of negligence and breach of express and implied warranties for its failure to notify plaintiff of changes made in its process of manufacturing unsaturated oil for plaintiff, where such changes caused plaintiff's final product to give off an intolerable odor. Having concluded that there was sufficient evidence to uphold the jury's verdict that the defendant was negligent, the *Neville* court was faced with the question of whether the contract which the parties entered into insulated the defendant from liability for its *own* negligence.[6] *Id.* at 1216. (emphasis added). In finding that the contract clause did not exculpate the defendant from liability for its own negligence the *Neville* court held that while the general law of Pennsylvania is that a private party may validly contract to relieve himself from liability for the consequences of its own negligent acts, these contracts are not favored by the law and will be strictly construed with every doubt resolved against the party seeking their protection. *Id.* at 1221.

Likewise, Hercules' reliance on *Husak v. Berkel, Incorporated*, 234 Pa.Super. 452, 341 A.2d 174 (1975), is misplaced. In *Husak* the plaintiff brought suit against Berkel seeking damages for personal injuries he sustained from a defective food grinding machine which plaintiff alleged Berkel's predecessor company had manufactured. Berkel, in turn, joined SCM as an additional defendant claiming that SCM not Berkel had succeeded to the liabilities of the manufacturer of the defective food grinding machine. 341 A.2d at 176. SCM moved for summary judgment on the basis of corporate successor liability. The facts which were established with respect to this issue demonstrated that SCM was indeed the successor to the manufacturer of the defective machine. *Id.* Nonetheless, SCM argued that Berkel's predecessor had assumed the liability for the injury when it purchased the assets and liabilities of the division of the company which had manufactured the defective machine.[7] On the basis of these facts the lower court granted SCM's summary judgment motion. On appeal, the Superior Court of Pennsylvania determined that although SCM would ordinarily be held liable on these claims as the successor of the company which manufactured the machine the question was wheth-

---

6. The pertinent language of the *Neville* contract provides:

 Paragraph 7

 Failure of Buyer to give notice of any claim with respect to any material delivered hereunder within fifteen (15) days after the receipt of such material shall be an unqualified acceptance of such material and a waiver by Buyer of all claims with respect thereto. Buyer assumes all risk and liability for the results obtained by the use of any material delivered hereunder in manufacturing processes of Buyer or in combination with other substances. No claim of any kind, whether as to material delivered or for nondelivery of material, shall be greater in amount than the purchase price of the material in respect of which such claim is made.

 In the first sentence of Paragraph 9 of the contract, it is provided:

 This Agreement contains all of the representations and agreements between the parties hereto and no warranties shall be implied. *Neville*, 422 F.2d at 1216.

7. The contract entered into between SCM's and Berkel's predecessors in interest which SCM claimed insulated it from liability for the disputed injury provided in pertinent part that:

 ... [Berkel] ... agrees to assume all liabilities, obligations, contracts, orders for the purchase of material and warranties of ... SCM ... made in connection with the manufacture and sale of products assigned hereunder to ... Berkel ... as part of the commercial and industrial line.
 *Husak*, 341 A.2d at 177.

er, in light of the contract clause, Berkel's predecessor had assumed the liability for the instant injury. *Id.* 341 A.2d at 177. In reversing the trial court's award of summary judgment, the court found that the disputed contractual clause lacked sufficient precision to meet the standards required to relieve SCM, as a matter of law, from liability for negligence or strict liability in connection with the production of a defective machine manufactured by its predecessor. *Id.* 341 A.2d at 178.

In both *Neville* and *Husak* the court strictly construed a contract where one party to the contract sought to insulate itself from liability for its own negligent acts. This is not the situation before the court today, however, and therefore neither of these cases are controlling here. Thus the only question is whether one of the exceptions to Hercules' broad assumption of liability applies.

■ The gravamen of Hercules' claim of nonliability as the successor of PICCO is that PICCO breached its warranty regarding the accuracy of its financial statements when it failed to include the instant liability on its balance sheet at the time of closing. However, this liability was unknown at the time of sale and, therefore, could not have been reflected in any financial statement. Nonetheless, Hercules argues that its contract with PICCO was very clear in this regard and because the instant liability was not disclosed, it was not assumed.

*Bouton v. Litton Industries, Inc.*, 423 F.2d 643 (3d Cir.1970) is instructive on this issue. In *Bouton* the selling corporation, McKiernan-Terry, (M–T), entered into an agreement and plan of reorganization in September of 1962 with Litton Industries, Inc., (Litton), wherein Litton acquired all the assets, business and goodwill of M–T in exchange for Litton stock and the assumption by Litton of certain M–T liabilities. *Id.* at 645. Plaintiffs, trustees in liquidation of M–T, brought a motion for summary judgment against Litton arguing that Litton was obligated, by contract, to assume the defense of certain actions brought against M–T and to pay any judg-

ments arising therefrom. *Id.* at 646. The disputed action, which is pertinent to the instant case, involved two personal injury claims which arose out of accidents allegedly caused by the failure of aircraft arresting engines made and sold by M–T in 1958. These claims occurred in 1963 and 1964 and were therefore unknown liabilities at the time of closing. *Id.* at 645.

On appeal from the district court's award of summary judgment in favor of the plaintiff, Litton argued that because the liabilities for the personal injuries were not reflected in M–T's balance sheet, M–T breached its warranty and thus Litton should not be held liable for the injuries. In affirming the district court's decision, the Court of Appeals dismissed Litton's argument stating:

> The only facet of the agreement to which Litton can point with even slight comfort in support of its contentions that it did not assume the obligation to insure against or pay the product liability claims is the absence of an express reference in the contract to such claims arising from future accidents. That absence is not significant. The draftsman throughout referred to broad categories of liabilities, not to narrow specifics.

*Id.*

Similarly, the court in *Bippus v. Norton Co.*, 437 F.Supp. 104 (E.D.Pa.1977), when faced with cross-motions for summary judgment on the issue of corporate successor liability, found that the absence of a reference to a product liability claim in an agreement for acquisition was not a bar to holding the successor corporation liable for the injuries. *Id.* at 107. The *Bippus* court pointed to the broad categories of liabilities assumed and concluded that the absence of a specific reference to product liability was not significant. *Id.*

In the instant case the Hercules-PICCO contract provided for the broad assumption of liabilities with certain limited exceptions. As such, Hercules' claim that it did not assume the liability for environmental pollution because it was not included in PICCO's balance sheet at closing is without

merit and, accordingly, I conclude that successor liability can be imposed upon Hercules.

Moreover, successor liability can be found on the additional ground that the sale of assets was a de facto merger.

 As previously noted, the Hercules-PICCO agreement was entitled an Agreement and Plan of Reorganization. However, because of the complex nature of corporate reorganizations and acquisitions the intrinsic nature of a transaction cannot be ascertained merely from the form by which it is structured. It is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir.1974) (Rosenn, J., concurring), *cert. denied* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975).

In determining whether a particular transaction amounts to a de facto merger as distinguished from an ordinary purchase and sale of assets most courts look to the following factors:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*See e.g., Shannon v. Samuel Langston Company*, 379 F.Supp. 797, 801 (W.D.Mich. 1974); *McKee v. Harris Seybold Co., Div. of Harris-Int. Corp.*, 109 N.J.Super. 555, 264 A.2d 98, 103–105, *aff'd*, 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972); *See also Knapp*, 506 F.2d at 365.

In *Knapp*, the plaintiff was injured in 1969 when his hand was caught in a machine that had been designed and manufactured by Textile Machine Works, (TMW) and sold to plaintiff's employer in 1966 or 1967. 506 F.2d at 361. In April of 1968, eighteen months prior to plaintiff's injuries, TMW entered into an agreement with North American Rockwell Corp., (Rockwell) whereby Rockwell acquired substantially all of the assets and liabilities of TMW in exchange for Rockwell stock. The agreement also stipulated that TMW was to dissolve as soon as possible. *Id.* at 363. Knapp brought his action against Rockwell in 1971 alleging his injuries resulted from the negligence of TMW in designing and manufacturing the machine and that Rockwell, as TMW's successor, was liable for such injuries. The transaction between TMW and Rockwell was characterized as a sale of assets. *Id.* at 361.

In reversing the district court's award of summary judgment in favor of Rockwell, the Court of Appeals held that, for the purposes of determining liability for tortiously injured parties, the Rockwell-TMW transaction should be treated as a de facto merger thereby subjecting Rockwell to liability for injuries caused by defective products distributed by TMW prior to the transaction. *Id.* at 367.

While cognizant of the general rule of nonliability for a corporation which merely purchases another's assets, the *Knapp* court nevertheless looked beyond the form of the transaction. In doing so the court enumerated several factors as indicia of a de facto merger: the exchange of substantially all of TMW's assets and liabilities for Rockwell stock; the nominal amount of cash which Rockwell left with TMW to cover the expenses of the transfer with the proviso that any funds remaining after dissolution was to be returned to Rockwell; and finally, the requirement that TMW was

to distribute the Rockwell stock to its shareholders and dissolve as soon as practicable. *Id.* at 363.

■ The factors which the *Knapp* court focused on in imposing liability on the successor corporation are likewise present here. The Hercules-PICCO agreement provided that Hercules was to acquire all the assets and substantially all of the liabilities of PICCO in exchange for Hercules stock; PICCO was to use its best efforts to keep its business organization intact, to keep available to Hercules the service of its present employees and to maintain its relationship with its customers and suppliers for Hercules' benefit; PICCO's management and personnel became a part of Hercules; PICCO was required, to the extent permitted by law, to transfer to Hercules the right to use its corporate name; PICCO was left with a nominal amount of money to dispose of its expenses in connection with the transaction and any money remaining was to be returned to Hercules; PICCO was required to dissolve as soon as practicable; and finally, following closing, Hercules continued to operate the PICCO plants, produce the same PICCO products and represented to PICCO's customers that PICCO resins had become a part of Hercules' Organics Department.[8]

Despite the factual similarity between *Knapp* and the instant case Hercules argues, relying on *Terry v. Penn Central Corp.*, 527 F.Supp. 118, *aff'd* 668 F.2d 188 (3d Cir.1981), that Pennsylvania has rarely invoked the de facto merger doctrine. Hercules' reliance on *Terry* is misplaced.

In *Terry* the plaintiff shareholders sought to enjoin defendant, Penn Central, through a subsidiary, from proceeding with an acquisition of defendant, Colt Industries, unless and until the plaintiffs were afforded the right to dissent and vote. *Id.* at 120. Plaintiffs claimed that the acquisition amounted to a de facto merger. *Id.* at 132. Faced with the issue of the rights of dissenting shareholders, Judge Pollak refused to apply the de facto merger exception in light of legislative changes which

restricted the availability of that doctrine in dissenting shareholder cases. *Id.* at 133. However, in reaching this conclusion, Judge Pollak pointed out the obvious distinction:

> The question in ... [*Knapp*] ... was one of essentially the survivorship of tort liability and one would certainly hope that courts would look to that issue in an entirely different way from the analysis that goes to determining the rights of shareholders to dissent and to vote.

*Id.* at 134.

After a careful examination of the substance of the transaction between Hercules and PICCO, it was my conclusion that not only did Hercules assume the liabilities of PICCO but also that the Hercules-PICCO transaction constituted a de facto merger. Therefore, Hercules' motion for summary judgment on this issue was denied and PECO's motion was granted.

## II. NUISANCE CLAIMS

Hercules' second contention in support of its motion for judgment n.o.v. and/or in the alternative for a new trial is that, as a matter of law, PECO is not entitled to nuisance damages.

■ The essence of a nuisance is an interference with the use and enjoyment of land. W. Prosser, *Handbook of the Law of Torts*, § 89, at 591 (4th ed.1971). As a general rule, one who creates a nuisance is liable for the resulting damages and ordinarily his liability continues for as long as the nuisance continues. *Smith v. Elliott*, 9 Pa. 345 (1848); *Ryan v. Commonwealth Dept. of Environmental Resources*, 30 Pa. Cmwlth. 180, 373 A.2d 475 (1977); *See New Jersey Dept. of Environmental Protection v. Exxon Corp.*, 151 N.J.Super. 464, 376 A.2d 1339 (Ch.Div.1977).

Relying on *Bouy v. Fidelity-Phila. Trust Co.*, 338 Pa. 5, 12 A.2d 7 (1940), Hercules' first argument is that PECO is not entitled to relief because the injury sustained was

---

**8.** *See* Summary Judgment Motion Exhibits P–D, P–E, P–F, & P–J.

not transmitted beyond the land where the objectionable condition existed.

The reliance on *Bouy* is misplaced. In the first place, Bouy was bottomed on *Harris v. Lewistown*, 326 Pa. 145, 150, 191 A. 34, 37 (1937) which was expressly overruled by *Reitmeyer v. Sprecher*, 431 Pa. 284, 243 A.2d 395 (1969). Secondly, unlike the physical injury problem faced by the court in *Bouy* this case involves pollution, the effects of which were transmitted "beyond the boundaries of the land upon which the objectionable condition exists." *Bouy*, 338 Pa. at 8, 12 A.2d 7.

■■■ The Clean Streams Law (Pa.Stat. Ann. tit. 35, § 691.1 et seq., Purdon 1977) expands the law of nuisance in the area of environmental pollution to impose liability on an owner or occupier of land for pollution which exists on his land irrespective of who was responsible for creating it. *National Wood Preservers, Inc. v. Commonwealth of Penna., Department of Environmental Resources*, 489 Pa. 221, 414 A.2d 37 (1980). In *Ryan v. Commonwealth, Dept. of Environmental Resources*, 30 Pa.Cmwlth. 180, 373 A.2d 475 (1975) the DER required a former lessee of a landfill to enter the land he previously leased in order to correct the nuisances which he created during the lease. 373 A.2d at 476. Ryan challenged the authority of the DER to make him comply with the order because he was not presently the owner or occupier of the land. *Id.* 373 A.2d at 477. Despite Ryan's non-proprietary

status, the court found that the DER had the "express, unconditional authority to protect the health of the citizens of this Commonwealth by ordering the abatement of nuisances." *Id.*

■■■ Moreover, the Clean Streams Law is a codification of the common law of nuisance relating to streams and waterways. *Com. ex rel Shumaker v. New York & Pennsylvania Co.*, 367 Pa. 40, 79 A.2d 439, 444 (1951).

"It is a principle of the common law, that the erection of anything in the upper part of a stream of water, which poisons, corrupts or renders it offensive and unwholesome, is actionable. And that principle not only stands with reason, but is supported by unquestionable authority ancient and modern.

*Howell v. McCoy*, 3 Rawle 256 (1832). Thus, there can be no question that if there are pollutants on property which are contaminating the waterways, an action can be brought against the property owner to abate the nuisance.

Hercules, however, takes the position that the controlling principles are those set forth in *Restatement (Second) of Torts* § 352 and 353 (1965).[9] I do not agree.

■■■ Section 352 sets forth the general rule of nonliability of a vendor or transferor of land for physical harm suffered by a vendee or others due to a dangerous condition which existed on the land at the time of transfer. Section 353 carves out a narrow exception whereby the vendor

---

9. § 352. Dangerous Conditions Existing at Time Vendor Transfers Possession

Except as stated in § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

§ 353. Undisclosed Dangerous Conditions Known to Vendor

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the

condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

**154**

will be subject to liability if he fails to disclose or conceals any condition which involves an unreasonable risk of harm to persons on the land. Neither section is applicable since they address a vendor's liability for physical harm to persons on the land whereas the instant case involves a claim for the costs of abating a nuisance. Thus § 840A provides the rule:

A vendor or lessor of land upon which there is a condition involving a nuisance for which he would be subject to liability if he continued in possession remains subject to liability for the continuation of the nuisance after he transfers the land.

Restatement of Torts (Second) § 840A.

Hercules urges the court to ignore this section because it has not been expressly adopted by the courts of Pennsylvania. But neither has it been rejected and as a general matter, the Pennsylvania courts have "not hesitated to adopt sections of the [Restatement] when [their] common law precedents varied from the Restatement or when the Pennsylvania common-law provide[s] no answer." *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 611–612, n. 25, 327 A.2d 94, 100 n. 25 (1975). (citing cases). There is no question in my mind that when and if the Supreme Court of Pennsylvania is presented with the opportunity it would accept § 840A as a statement of the rule in Pennsylvania. This is implicit in *Ryan v. Commonwealth, Dept. of Environmental Resources,* 30 Pa.Cmwlth. 180, 373 A.2d 475 (1975); *National Wood Preservers, Inc. v. Commonwealth, Dept. of Environmental Resources,* 489 Pa. 221, 414 A.2d 37 (1980).

Moreover, my conclusion that Hercules can be held accountable for the abatement of the nuisance which its predecessor created is supported by analogous cases in other jurisdictions. *See State v. Ole Olsen, Ltd.,* 76 Misc.2d 796, 352 N.Y.S.2d 97 (1973) (of-

fensive sewage disposal units in a number of housing developments created a nuisance for which builder can be responsible); *City of Jackson, Mississippi v. Filtrol Corp.,* 624 F.2d 1384, 1390 (5th Cir.1980) (court permitted an easement holder to recover damages in nuisance against the owner of the property who had contaminated its subsoil with sulfuric acid.)

I have no difficulty in predicting that if the Supreme Court of Pennsylvania had this case before it, it would impose liability on Hercules for the nuisance which its predecessor created at the Chester site.

## III. THE INJUNCTION

The most substantial of Hercules' post-verdict claims is that the court erred in ordering mandatory relief. In response to special interrogatories the jury found that PICCO caused the contamination of the property [10] and that the contamination continues to pollute the groundwater and the Delaware River.[11] Based on these findings I entered the following order:

... IT IS FURTHER ORDERED AND DECREED that Hercules, Inc. shall forthwith take all appropriate action to abate and eliminate the contamination on the property of the Philadelphia Electric Company located at the Chester Site and abate the further pollution of the ground water and the Delaware River adjacent to the property by collecting and removing all pollutants in accordance with all applicable rules and regulations of the Pennsylvania Department of Environmental Resources, the United States Environmental Protection Agency, and any other appropriate state or federal regulatory agency; ...

Hercules makes three arguments with respect to the injunction: first, that this court lacked the authority to award the

**10.** The jury responded "yes" to special interrogatory # 1 which asked:

"Do you find by a preponderance of the evidence that PICCO caused the contamination on the property now owned by Philadelphia Electric Company?"

**11.** The jury responded "yes" to special interrogatory # 2 which asked:

"Do you find by a preponderance of the evidence that the contamination on the property now owned by Philadelphia Electric Company continues to pollute the ground water or the Delaware River."

injunction; second, that there was insufficient evidence to warrant mandatory relief; and last, that it was substantially prejudiced because it proceeded to trial on the basis that injunctive relief was not an issue.

█ PECO's complaint alleged that Hercules' predecessor, PICCO, created a continuing nuisance on the Chester Site, *See* Paragraphs 8, 10, 17, 22, and 23 of Complaint, and it supported this claim by evidence showing as follows: PICCO, Hercules' predecessor was a resin manufacturing plant; during PICCO's operation of the Chester Site it dumped resins into a lagoon on the property to neutralize their acidic quality; a DER representative visited the Chester Site and found a resinous material in the lagoon and oozing from the banks of the property into the Delaware River; samples taken from the property turned out to be hydrocarbon resins which compared favorably to resins identified as PICCO materials; this hydrocarbon resinous material was in the groundwater under the property and leaching from the banks of the property into the Delaware River; and lastly, this material is presently oozing from the surface of the property.

Hercules offered evidence that Gould, not its predecessor PICCO, created the nuisance on the land but the jury, rejected this version of the facts and found in favor of PECO. There was ample evidence to support the jury's determination and I can find no basis upon which to overturn that finding.

The jury's determination that the contamination on the Chester Site continues to pollute the groundwater and the Delaware River is grounds for injunctive relief. It has long been the rule in Pennsylvania that once a continuing nuisance is established, an injunction is an appropriate remedy. *Krocker v. Westmoreland Mill Co.,* 274 Pa. 143, 117 A. 669 (1922); *Keppel v. Lehigh Coal and Navigation Co.,* 200 Pa. 649, 50 A. 302 (1901); *Stewart v. Foltz's Appeal,* 56 Pa. 413 (1867); *Bradley v. Valicenti,* 185 Pa.Super. 403, 138 A.2d 238 (1958).

█ Hercules' bald assertion that it has been substantially prejudiced by the granting of an injunction finds little substance in the record.

The Complaint stated a claim for a continuing nuisance and in addition to damages, the prayer requested "such other and further relief as may be just." This was clearly sufficient to put defendant on notice particularly in light of the fact that the only practical way to abate a continuing nuisance is by mandatory relief. Moreover, Fed.R.Civ.P. 54(c) provides, in part, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings.*" (emphasis added). Also, it should be noted that plaintiff's pretrial memorandum filed eleven days before the commencement of trial specifically requested injunctive relief. Hercules neither objected nor moved to strike this demand.

Finally, if Hercules believed that relief from a continuing nuisance was not an issue in the case, it certainly would have objected to Interrogatory #2 (See Footnote 11, supra) as irrelevant and immaterial, but it did not. Hercules' argument that injunctive relief was not an issue because I denied PECO's motion on the eve of trial to amend the Complaint to assert a claim under the Clean Streams Law is without merit. That statute expressly provides that actions under the Clean Streams Law are not to be construed as the exclusive remedy for abating nuisances. Pa.Stat.Ann. tit. 35 § 691.701 (Purdon 1977).

Hercules' also maintains that the teaching of *United States v. 47 Bottles More or Less, Etc.,* 320 F.2d 564 (3d Cir.1963), precludes the granting of an injunction under the circumstances presented here. I do not agree.

*47 Bottles* involved a condemnation proceeding under the Federal Food, Drug and Cosmetic Act wherein the government was permitted to amend its complaint to add a prayer for injunctive relief at the conclusion of the trial. *Id.* at 567. In reversing

the award of injunctive relief the court held that the trial judge abused his discretion in permitting the injection of a new and different prayer for relief at the terminal stage of the case after the evidence had been closed and the court had made its findings. *Id.* at 573.

Such is not the case here. Hercules had ample notice before trial of the plaintiff's demands. Significantly, the court in *47 Bottles* distinguished *United States v. 184 Barrels of Dried Whole Eggs*, 53 F.Supp. 652 (E.D.Wis.1943) by pointing out that there the amendment requesting injunctive relief was made "at an early stage of the trial." 320 F.2d at 574.

Hercules' remaining contentions find no support in the record and therefore will not be discussed. Hercules' motion for judgment n.o.v. and/or in the alternative, for a new trial are therefore denied.